MATTER OF NORTHWEST AIRLINES AIRCRAFT, "FLIGHT NUMBER 4"

In Fine Proceedings

SEA-10/61.167

*Decided by Board November 12, 1971*

(a) Where an arriving alien withdrew his application for admission, was re- manded to the custody of the carrier, notice was thereupon served upon the carrier to remove him from the United States, and the alien thereaf- ter absconded, liability to fine is incurred under section 271 of the Immi- gration and Nationality Act for failure to prevent his unauthorized land- ing.

(2) Where, without further safeguards, the carrier took the alien involved to the hotel and advised the hotel manager the alien would be picked up the following morning for deportation, mitigation of the $1,000 imposed fine beyond the extent of $300 is not warranted, since there is no indica- tion the carrier exerted earnest efforts to locate the alien after he ab- sconded and the alien is still at large in this country.

BASIS FOR FINE: Act of 1952—Section 271(a) [8 U.S.C. 1323]

IN RE: NORTHWEST AIRLINE AIRCRAFT, *"Flight Number 4,"* which arrived at the port of Seattle, Washington, from foreign, on May 5, 1971. Alien passenger involved: CANISIO BUENA, JR. aka TEDDY VILLAFLOR

ON BEHALF OF CARRIER:
Clifford O. Weiger, Director—
  Facilitation
Northwest Airlines, Inc.
Minneapolis-St. Paul Interna-
  tional Airport
St. Paul, Minnesota 55111

ON BEHALF OF SERVICE:
Robert A. Vielhaber
Appellate Trial Attorney

The District Director, Seattle, Washington, in a decision dated June 21, 1971, held that Northwest Airlines, Inc., as owners/operators of the above-described aircraft, had incurred liability to an administrative penalty of $1,000 for failure to pre- vent the illegal landing of the above-named alien passenger in the United States at a time and place other than as designated by an immigration officer. However, said official found present herein factors which, in his opinion, merited mitigation of the penalty to

840

the extent of $300. Thus, he permitted a fine of $700 to stand herein.[1]

It appears from the record before us that the following material facts exist without substantial controversy. The carrier brought the male alien named above, a native and national of the Republic of the Philippines, to the United States as a passenger at the time, place and in the manner described above. He presented a passport issued by the Republic of the Philippines containing a nonimmigrant visa of the B-2 (temporary visitor) type. However, the examining immigration officer ascertained that the passport had been altered and did not relate to the passenger.

Thereupon, the passenger was informed that his application for admission would have to be referred to a special inquiry officer, or that he could withdraw his application for admission without prejudice and return to the Philippines on the next available flight. The alien chose the latter course and then was remanded to the custody of the airline which brought him to the United States.

At that point, a Form I-259, Notice to Remove the Alien from the United States, was served upon a representative of the carrier, directing that the alien be removed to the Philippines on May 6, 1971. The carrier did make hotel reservations for the passenger, took him to the hotel and advised the hotel manager that he was to be deported and would be picked up for departure the following day. In the early hours of the morning thereof, however, he absconded and to date has not been apprehended.

The Congress, in enacting this section of the law, made it the duty of the owners, officers and agents of carriers to prevent the landing of aliens in the United States at any time or place other than as designated by immigration officers. Clearly, the intention of the statute was to make imperative the duty of preventing such unlawful landing of aliens as occurred here. That is, section 271 of the Immigration and Nationality Act calls for the imposition of a penalty (fine) where, as here, the persons specified in the statute failed in their duty to prevent an illegal entry. In other words, the statute creates a positive duty on the part of the

---

[1] The apparent confusion in the mind of the carrier's representative stemming from the District Director's interchangeable use of the terms "fine" and "penalty" (oral argument, p. 5), which are synonymous and so used throughout the statute (see sections 271, 272 and 273), was apparently resolved to his satisfaction when it was explained that the total sum for which the carrier was responsible was $700 (oral argument, p. 8).

persons named therein (makes the carrier an insurer) to prevent the illegal entry into the United States of aliens brought here on a vessel or aircraft See *Matter of Plane "NC–SJD–004,"* 5 I. & N. Dec. 482 (BIA, 1953), and *Matter of Plane "N–8224–H,"* 6 I. & N. Dec. 594 (BIA, 1955).

On the basis of the foregoing, we find that the District Director has properly concluded that liability to a fine has been incurred in this instance. The alien passenger did escape from the carrier's custody and gained his enlargement in the United States. Therefore, the carrier failed to meet its statutory duty of preventing the landing of the alien in the United States at any time or place other than as designated by an immigration officer. All we can add, in this connection, is that while the carrier's representative did devote a considerable portion of his oral argument on appeal in an attempt to establish that no fine should be imposed because of the exercise of due diligence on the carrier's part, he eventually conceded that on the facts and under the law the carrier has properly been made subject to a penalty or fine (oral argument, p. 13).

There remains, however, the question of whether more mitigation than has already been authorized by the District Director is warranted in these premises and, if so, how much. In this connection, the District Director reduced the penalty to the extent of $300 because the carrier did accept custody of the alien involved after withdrawal of his application for admission, did make arrangements for him to stay at a hotel, did advise the manager thereof that he was to be deported the following day and did notify the Service of his escape with reasonable promptness. In so doing, the District Director cited the criteria for mitigation in cases of this type laid down in *Matter of TACA, International Airlines Plane, Flight 110,* Interim Decision No. 2006 (BIA, 1969).

The carrier first contends that it exercises reasonable diligence in accepting this alien passenger for transportation to the United States on the basis of a valid ticket and an apparently valid passport and temporary visitor's visa. This argument, however, is properly directed to fine cases arising under section 273 of the statute rather than section 271 thereof, which is the basis for these fine proceedings. In the latter instance, the question of remission or mitigation of the fine depends upon the positive steps taken by the carrier to prevent the alien's illegal entry into the United States after arrival here.

The carrier next attempts to distinguish this case, wherein the

carrier did refer the passenger to the appropriate immigration officials on arrival, from the precedent decision relied on by the District Director, *supra*, wherein the alien passenger was not so referred. This argument, however, overlooks the fact that the violation charged is failure of the carrier to remove the alien from the United States following the referral in question, and after the carrier had been placed on notice to so remove him. Logically, therefore, the amount of mitigation merited in this instance depends upon the steps taken by the carrier after it had been notified to remove the alien.

The carrier stresses that its problems in removing this alien were complicated by the fact that immigration processing of the alien passenger was not completed until after its last scheduled flight for that particular day had departed, so that it could not remove the alien until the day following. This, of course, is a hazard of the trade which the carrier must overcome. All we can add on this point is that the record reflects no undue delay on the part of the Service in processing the alien passenger.

The carrier insists that it does not have the right or the power to restrain an individual without submitting itself to possible legal action for damages resulting from an unlawful restraint. This point, however, is inconsistent with its action in other cases referred to in the District Director's opinion wherein it has arranged with a professional guard service to provide for keeping an alien such as the one here involved in custody until removal from the United States. It is also inconsistent with the carrier's following argument that the Service should have notified it that the alien was a security risk, or might abscond, because then it would have kept him under guard.

In the latter connection, the carrier refers to a communication of August 25, 1969, from the Associate Commissioner, Operations, Immigration and Naturalization Service, addressed to the Director, Facilitation, Air Transport Association of America.[1] Specifically, the carrier refers to the last paragraph thereof which sets forth that, in cases where it is necessary to defer the inspection of an alien, the carrier will be requested in writing to remove the alien to a designated place at a designated time, where there are strong reasons to believe the alien may abscond, or represents a threat to the national safety, security or welfare. Clearly, that paragraph is not applicable in this case which does not involve the matter of deferred inspection.

In support of the foregoing point, the carrier submitted a No-

---

[1] See Appendix.

843

tice of Intention to Fine (Form I-79) in the case of another alien it had been ordered to remove from the United States, wherein the Service did warn that the alien might attempt to abscond. It sought to strengthen its position by pointing out that the Service itself very frequently deports aliens without guards, but that when it does deport aliens who are high security risks it delivers them to the carrier just prior to departure, guards them until they have boarded the aircraft, and has Service officers check along the route to ensure that the aliens remain aboard the aircraft. But, again, these representations overlook the controlling fact that the carrier failed to meet its statutory duty of preventing the alien's illegal entry into the United States after appropriate notice in compliance with the statute and implementing Service policy.

Finally, that the carrier was not misled by the Service and fully understood its responsibility becomes clear from the fact that it did make hotel reservations for the alien passenger to be used by him until his departure could be effected the next day, that it did take the passenger to the hotel and did advise the hotel manager that the alien was to be deported and would be picked up by the carrier for departure the following day. Accordingly, and in the light of the foregoing, we find no abuse of discretion on the part of the District Director in limiting his mitigation of this fine to the extent of $300. All we can add is that we find nothing in the record to indicate that the carrier exerted earnest efforts to locate the alien after he had absconded, and that he is still at large in this country. Therefore, we do not find that any change is warranted in the decision of the District Director, which is hereby affirmed.

**ORDER:** It is ordered that the request for further mitigation of the fine be denied and that the appeal be and the same is hereby dismissed.

### APPENDIX

#### UNITED STATES DEPARTMENT OF JUSTICE
IMMIGRATION AND NATURALIZATION SERVICE
WASHINGTON, D.C. 20536

CO 235-P

Aug. 25, 1969

Mr. James R. Gorson
Director - Facilitation
Air Transport Association
of America
1000 Connecticut Avenue, N.W.
Washington, D.C. 20036

Dear Mr. Gorson:

Reference is made to Item 8 on the agenda of the Joint Airline/Government Facilitation Meeting sponsored by your Association which was held at Vancouver, British Columbia on June 3 through June 5, 1969. The problem stated in that item is:

From time to time, airlines encounter problems in the case of properly documented visitor arrivals whose U.S. Immigration inspection is deferred to a later date or to another city. Since the airline is held responsible for the subsequent appearance of the alien for the deferred inspection, custody of the passenger pending inspection is necessary.

In discussions at the meeting concerning this item, various airline representatives questioned the legality or the propriety of certain Service procedures involving aliens whose inspection was deferred. The Service promised to study the matter and present its conclusions to your Association.

The delay in furnishing these conclusions was occasioned by the careful study which has been given to this matter. Involved in the study are the provisions of sections 233, 235, 237, 239 and 271 of the Immigration and Nationality Act, and relating regulations under Title 8 of the Code of Federal Regulations. The following conclusions have been reached.

1. Except as hereafter indicated, the carrier is legally responsible for safeguarding the passenger and preventing his unauthorized landing until his inspection is completed.

2. The Service has the authority to defer inspection of any passenger when such deferment is deemed desirable or necessary, and to designate a time and place where he may be presented for inspection.

3. Such deferment of inspection does not relieve the carrier of the obligation to safeguard the passenger and prevent his unauthorized landing unless he is removed temporarily by a Service officer for further proceedings or the passenger is paroled without a request in writing being made to the carrier to present the passenger at a designated time and place.

4. If the Service desires to complete the passenger's deferred inspection at an Immigration office at the port of entry, it may direct in writing that the carrier "present" the passenger there without ordering "removal" and without relieving the carrier of its obligation to safeguard the passenger and prevent his unauthorized landing.

5. If the carrier which brought the passenger to the United States has contracted to carry him to an onward destination, and the Service directs the carrier in writing to "present" the passenger for further inspection at such subsequent destination, the carrier is legally obligated to continue to safeguard the passenger and prevent his unauthorized landing until he is inspected at the designated place, and an order of "removal" is not required.

6. When "removal" of the passenger is not ordered, the carrier must pay any expenses of maintaining the passenger until the inspection is completed, unless he is paroled by the Service without any request being made upon the carrier to present him for further inspection.

7. When "removal" is ordered by the Service, the carrier is relieved of the responsibility for safeguarding the passenger, unless the carrier assumes such responsibility by executing Form I-259A or I-259B.

845

8. The statutory formulas regarding liability for removal and detention expenses apply only when the passenger's "removal" is ordered.

Despite the foregoing, it is realized that prolonged deferment of inspection may impose an onerous burden upon the passenger and the carrier. It is the Service's desire to minimize these burdens to the extent possible in the interest of facilitating travel. Accordingly, the Service intends to follow the following principles when it is necessary to defer inspection of an alien:

1. In cases in which the inspector is fully satisfied that the alien will appear for further inspection as direceted and the alien represents no threat to the national safety, security or welfare, the inspector will parole the alien on the alien's own recognizance without making any request in writing to the carrier to present the alien at any future time. In such cases the carrier is relieved of further responsibility with respect to presentation of the alien for inspection.

2. In cases where there is some doubt that the alien will appear for further inspection as required, a request will be made to the carrier in writing to present the alien at a designated time and place for further inspection. Where the alien is proceeding to an onward destination via the same carrier which brought him to the United States, the carrier may be requested to present the alien to an Immigration office at the onward destination. Insofar as feasible, the request to the carrier will indicate that the alien is to be presented no later than the next weekday following the alien's arrival at the initial U.S. port of entry or his arrival at the onward destination to which he is being transported by the same carrier. To insure that the pertinent documents are delivered timely to the Service office to which inspection has been deferred, the carrier may be requested to present those documents with the alien. When the alien is so presented, the Service will make every effort to relieve the carrier of any further responsibility with respect to presenting the alien for inspection.

3. In cases where there are strong reasons to believe the alien would abscond, or that he represents a threat to the national safety, security or welfare, the carrier will be requested in writing to remove him to a designated place at a designated time.

Copies of this letter are being distributed to field offices of this Service for compliance with the principles enunciated therein.

Sincerely,

/s/ James F. Greene

James F. Greene
Associate Commissioner
Operations